## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Raymond P. Moore

Case No. 14-cv-03106-RM-CBS

SUSAN CVANCARA,

      Plaintiff,

v.

STEVE REAMS,

      Defendant.

---

## OPINION AND ORDER

---

On November 18, 2014, plaintiff Susan Cvancara ("plaintiff") filed a Complaint against John Cooke in his official capacity as Sheriff of Weld County, Colorado. (ECF No. 1).[1] Therein, plaintiff raised two claims for relief, one of which has now been voluntarily dismissed. (ECF No. 15.) The sole remaining claim is brought pursuant to 42 U.S.C. § 1983 for defendant's alleged retaliation against plaintiff's exercise of her First Amendment right to free speech. (ECF No. 1 at ¶¶ 42-52.)

Pending before the Court is defendant's motion for summary judgment as to plaintiff's First Amendment claim ("the motion for summary judgment") (ECF No. 29) and statement of undisputed material facts (ECF No. 30). Plaintiff has filed a response in opposition to the motion for summary judgment (ECF No. 31), a response in opposition to defendant's statement of undisputed material facts (ECF No. 31-12), and an affidavit ("affidavit") (ECF No. 31-1). Defendant then filed a reply

---

[1] On February 2, 2015, John Cooke was replaced as the named defendant in this case by present Sheriff of Weld County, Colorado, Steve Reams ("defendant"). (ECF No. 20.)

(ECF No. 32) and a reply statement of undisputed material facts ("the RSUMF") (ECF No. 33). Defendant has also filed a motion to strike plaintiff's affidavit ("the motion to strike") (ECF No. 37), to which plaintiff has responded (ECF No. 42) and defendant has filed a reply (ECF No. 43).

For the reasons discussed herein, the motion for summary judgment is GRANTED, and the motion to strike is GRANTED IN PART and DENIED IN PART.

## I.     Motion to Strike

Before turning to the factual background, the Court will first address defendant's argument that plaintiff's affidavit should not be considered in discussing the undisputed material facts of this case.   Defendant argues that plaintiff's affidavit should be struck from the record because it contradicts or arguably contradicts plaintiff's deposition testimony.  (*See generally* ECF No. 37.) Specifically, defendant takes aim at: paragraphs 7, 8, and 23 of the affidavit because they are based on "awareness, belief, speculation, or understanding"; paragraphs 15, 17, 19, and 20 because they attempt "to recall more clearly" certain meetings; and paragraphs 19 and 23 because "they constitute ultimate facts, arguments, or inferences."  (*Id*. at 7.)

The Court agrees with defendant in part.  With respect to paragraphs 7 and 8, defendant's argument is misplaced.  Defendant challenges those paragraphs because plaintiff uses the phrase "I was not aware" or "I am not aware."  (*Id*.; *see* ECF No. 37-2 at ¶¶ 7, 8.)  To the extent that defendant is concerned that these statements reflect impermissible beliefs or speculation, the Court does not, and will not, construe them as such.  Rather, the Court merely construes them as plaintiff asserting that, based on her personal knowledge as a former employee of the Sheriff's Office, the facts alleged in those paragraphs did not exist.  *See* Fed.R.Civ.P. 56(c)(4) (providing that affidavits must be made on personal knowledge).  Paragraph 23 is of a different order however.  Therein, plaintiff asserts that:

"To [her] knowledge, no one in the Sheriff's Office ever investigated any of my concerns about Ms. Calvin prior to terminating my employment." (ECF No. 37-2 at ¶ 23.) Plaintiff provides no basis, though, for finding that she has or had personal knowledge of whether the Sheriff's Office investigated Ms. Calvin. Thus, paragraph 23 is stricken from plaintiff's affidavit, and will not be considered.

Turning to paragraph 15, defendant asserts that this statement attempts to more clearly recall plaintiff's meeting with two other individuals. (ECF No. 37 at 7.) Paragraph 15, however, does not mention any meeting. (*See* ECF No. 37-2 at ¶ 15: "Prior to the incident which is the subject of this lawsuit, I was never called upon by the Weld County Sheriff's Office to report or investigate possible government corruption or malfeasance as part of my job.") Thus, defendant's argument is misplaced. As for paragraph 17, defendant's argument is again misplaced, but for a different reason. Defendant asserts that this paragraph is improper because it attempts to recall more clearly a different meeting. Defendant is correct that paragraph 17 does address that meeting, however, other than providing a long list of plaintiff's deposition testimony, defendant fails to explain how the affidavit contradicts or arguably contradicts the same. Merely because plaintiff's deposition testimony may reflect that she spoke to others about more than just the topics mentioned in paragraph 17 does not make that paragraph contradictory, especially given that the paragraph does not suggest that the topics mentioned therein were the sole topics discussed at the meetings.

Paragraphs 19 and 20, though, are entirely improper. In those paragraphs, plaintiff attempts to assert the reasons for her suspicion of a co-worker (paragraph 19) and her belief that certain items found in a car belonged to the same co-worker (paragraph 20). Plaintiff argues in her response that she should be entitled to testify, with respect to paragraph 19, about whom the items belonged, when

3

and where she found them, and who had access to the car. (ECF No. 42 at 4.) However, paragraph 19 hopes to do much more than that, as the reason for mentioning these subjects is to provide a basis for plaintiff's "reason[able] suspicion" that a co-worker was engaged in impropriety; something that is based solely on her own speculation. The same is true of paragraph 20; another statement that is based on plaintiff's inferences from known facts. It is not plaintiff's role to make such inferences in the affidavit. *See* Fed.R.Civ.P. 56(c)(4). As a result, paragraphs 19 and 20 are stricken from plaintiff's affidavit, and will not be considered.

One final note on this matter is that it is largely irrelevant to the discussion of the factual background *infra*. This is because in her response statement of undisputed material facts, plaintiff cites to her affidavit—which is Exhibit 1 to the response statement—only once. (*See* ECF No. 31-12 at ¶ 53.) Moreover, as discussed in footnote 8 *infra*, this solitary citation violates the Court's Civil Practice Standards; specifically, Civil Practice Standard IV(B)(2)(b)(ii). Thus, even if the Court had failed to grant the motion to strike in any respect, plaintiff has failed to properly present any alleged facts from her affidavit.

## II.   Factual Background

The following uncontested facts are taken from the RSUMF (ECF No. 33), which, consistent with this Court's Civil Practice Standards, contains defendant's initial statement of uncontested material facts, plaintiff's response statement of uncontested material facts, and plaintiff's reply statement.[2]

---

[2] In her response statement of uncontested material facts (ECF No. 31-12), plaintiff responds to a large proportion of defendant's statements as simply "Undisputed[,] Immaterial." (*See, e.g.*, *id.* at ¶¶ 3, 4, 9-19, 25-41, 47, 59, 62-67.) While the Court agrees in some instances that the pertinent statements are immaterial to the underlying issue in this case—whether plaintiff's speech is protected by the First Amendment, and, if so, to what extent—many of the statements that are responded to in this fashion are very material. In any event, plaintiff provides no explanation of why the pertinent statements are "Immaterial," and the Court will not do so for her. Thus, even for those statements that the Court does not

In August 2005, plaintiff was hired by the Weld County Sheriff's Office ("the WCSO"), where she initially worked as the Director of the Victim Services Unit ("the VSU"). (ECF No. 33 at ¶¶ 1, 2). In July 2006, plaintiff received a copy of the Weld County Code personnel policies. (*Id.* at ¶ 3.) In January 2010, plaintiff was suspended, in part, for providing cigarettes to a minor and indicating disagreement with a hospital policy related to cervical examinations of certain victims. (*Id.* at ¶¶ 11, 12, 15.)

Sometime in January 2011,[3] plaintiff received a "Deficient Performance Notice" ("the DPN"). (*Id.* at ¶ 24.) The DPN stated that, "over the past four years, there was a reoccurring issue with [p]laintiff spreading rumors and disparaging comments about the WCSO, other employees, volunteers, and others." (*Id.* at ¶ 25.) The DPN further stated that four subordinates had described plaintiff's behavior as "rude and offensive," while three of plaintiff's subordinates had quit because they had been unable to work with her. (*Id.* at ¶¶ 26, 27.)

In February 2011, an inquiry was conducted into a further complaint against plaintiff. (*Id.* at ¶ 30.) The written report of the inquiry stated that plaintiff had previously agreed to correct her behavior, but failed to do so. (*Id.* at ¶ 32; ECF No. 30-8 at 10.)[4] The report ultimately recommended terminating plaintiff's employment for various policy violations, including Truthfulness and Teamwork. (ECF No. 33 at ¶ 32; ECF No. 30-8 at 10.)

---

deem directly relevant to the issues presently before it, certain of those statements have been utilized to provide context to the specific events at issue here.

[3] The parties dispute when plaintiff received the DPN (ECF No. 33 at ¶ 24), however, the fact that the DPN was issued and received at some point in January 2011 is not disputed, nor are defendant's statements regarding the content of the DPN. (*See id.* at ¶¶ 24-29.)

[4] In citing to the written report of this inquiry, defendant violates the Court's Civil Practice Standards in failing to cite to the specific page of the exhibit to which the pertinent factual statement applies. (*See, e.g.*, ECF No. 33 at ¶¶ 31, 32); Civil Practice Standard IV(B)(2)(a)(ii). As will be seen, this would not be the only occasion of defendant ignoring this rule.

On March 3, 2011, Deputy Chief Reams of the WCSO issued a memorandum regarding "Personnel Recommendation" for plaintiff, which recommended demoting plaintiff to the position of "Specialist" within the VSU. (ECF No. 33 at ¶ 33; ECF No. 30-9 at 3.)[5]  The next day, Bureau Chief Randy Winsett issued a memorandum agreeing with the recommendation to demote plaintiff. (ECF No. 33 at ¶ 35; ECF No. 30-9 at 4.)  On March 22, 2011, Commander Ken Poncelow issued a memorandum demoting plaintiff to the position of "Victim's Advocate Specialist."  (ECF No. 33 at ¶ 36; ECF No. 30-15 at 3.)[6]  The memorandum stated that, since October 28, 2010, plaintiff had violated various policies of the WCSO, and warned plaintiff that future similar incidents would "result in more severe disciplinary action, up to and including termination."  (ECF No. 33 at ¶ 41; ECF No. 30-15 at 3.)  Plaintiff signed the memorandum on March 21, 2011.  (ECF No. 30-15 at 4.)

In January 2012, plaintiff received a written reprimand from Commander Ed Haffner.[7]  (ECF No. 33 at ¶ 42; ECF No. 30-6 at 3.)   Therein, plaintiff was advised of various policy violations related to inappropriate interactions with co-workers.  (ECF No. 33 at ¶¶ 43-44; ECF No. 30-6 at 2-3.)  The written reprimand warned plaintiff that any further action of a type discussed therein "may result in further disciplinary action up and to termination."  (ECF No. 30-6 at 3.)

On October 8, 2013, plaintiff spoke with Investigator David Porter ("Porter") of the WCSO. (ECF No. 33 at ¶ 47; ECF No. 30-10 at 2.)  In a subsequent "Witness Statement," Porter recounted

---

[5] As with the exhibit referenced in footnote 4, defendant again fails to cite to the specific page of the memorandum to which it refers in its factual statements.  (*See, e.g.*, ECF No. 33 at ¶ 34.)

[6] This memorandum is yet another example of defendant's failure to abide by Civil Practice Standard IV(B)(2)(a)(ii).  (*See, e.g.*, ECF No. 33 at ¶¶ 36-41.)

[7] Although plaintiff disputes that she "acknowledged" the written reprimand, she does not dispute that the reprimand was received or its contents.  (ECF No. 33 at ¶ 42.)  Continuing in a similar vein from other exhibits, defendant again chose not to cite to the specific pages of the reprimand applicable to its factual statements.  (*Id*. at ¶¶ 43-46.)

the conversation with plaintiff as follows.  Plaintiff expressed frustration with new policies, which she stated shifted a disproportionate amount of work to her, rather than to Deborah Calvin ("Calvin")—the new Director of the VSU.  (ECF No. 30-10 at 2.)  The new policies were confusing to plaintiff because they conflicted with existing policy.  Plaintiff said that Calvin was trying to implement a new standard whereby all victim issues would be handled at bond hearings.  Plaintiff believed that this was an issue for the Weld County District Attorney's Office.  Plaintiff stated that Calvin had been hired because of political connections.  Plaintiff further stated her belief that Calvin was "working a real estate job while working on the WCSO clock."  Porter advised plaintiff to follow the chain of command to address her issues.  Porter noted in the Written Statement that plaintiff was not making "inappropriate or slanderous statements," and stated that plaintiff had "always been a great asset …."  (*Id*.)

By October 11, 2013, Sergeant Peter Wagoner ("Wagoner") had begun preparing a written memorandum concerning his investigation into whether plaintiff violated orders and/or was untruthful to her supervisor with respect to her conversation with Porter on October 8.  (ECF No. 30-11 at 1.)[8]  The memorandum explains the investigation as follows.  On October 9, 2011, Wagoner and Calvin met with plaintiff.  (ECF No. 33 at ¶ 58.)  Calvin asked plaintiff who she had spoken with

---

[8] In citing to Wagoner's memorandum, defendant again chooses not to cite to any specific page therein.  (*See, e.g.*, ECF No. 33 at ¶¶ 53-62.)  Not to be outdone, though, in disputing the first factual statement related to this exhibit, defendant cites without further delineation to three exhibits.  (*See id.* at ¶ 53.)  Two of those exhibits are transcripts and the other is an affidavit—all of which have easy methods of providing pinpoint citation.  Defendant chose, however, not to do so.  The purpose of the Court's Civil Practice Standards with regards to summary judgment motions is to avoid the time-consuming endeavor of sifting through reams of evidentiary support, particularly transcripts.  The Court will not start doing so now.  While the Court has exercised generous latitude to defendant's indiscretions, in part, this is due to plaintiff's failure to object.  (*See generally* ECF No. 31-12.)  Defendant, though, has objected to plaintiff's insufficiencies in this regard.  (*See* ECF No. 33 at ¶ 53.)  Thus, the Court sustains defendant's objection, and will not consider the factual statement in paragraph 53 as properly disputed.  *See* Civil Practice Standard IV(B)(2)(b)(ii).

7

about recent policy changes, and plaintiff responded that she had only spoken to Commander Haffner about the same. (*Id.* at ¶¶ 59-60.) Plaintiff was asked about Calvin's hiring, and she said that she did not know that Calvin was politically connected. (ECF No. 30-11 at 5.) Plaintiff was also asked about Calvin working her real estate job while "on County time," and plaintiff responded that she did not say that to anyone. (*Id.*) On October 10, 2013, Wagoner received a written statement via email from plaintiff. (*Id.* at 6.) In the written statement, plaintiff said that she had only spoken with Commander Haffner regarding policy changes. (*Id.*; ECF No. 33 at ¶ 62.) On October 15, 2013, Wagoner met with plaintiff about his investigation. (*Id.* at ¶ 64; ECF No. 30-11 at 6.) Wagoner asked plaintiff who she had spoken to on October 8, and she again stated Commander Haffner. (ECF No. 30-11 at 6.) Wagoner told plaintiff that he knew that was not true, and plaintiff then said that she had spoken with Porter. (*Id.* at 6-7.) Plaintiff was asked about Calvin doing real estate work, and plaintiff said that, when other victim advocates from the area had heard Calvin was in the running for a job, plaintiff got calls from some of the other advocates telling her that plaintiff was a realtor and that she was known to do her real estate job while working as an advocate at another police department. (ECF No. 33 at ¶ 68; ECF No. 30-11 at 7.)

In the "Investigative Findings" section of the memorandum, Wagoner found that plaintiff had violated orders by not adhering to her chain of command when expressing concerns with policy changes. (ECF No. 33 at ¶ 72; ECF No. 30-11 at 7.) Wagoner further found that plaintiff had violated WCSO procedures and Weld County Code provisions concerning truthfulness, failing to accept responsibility for her actions, and insubordination. (ECF No. 33 at ¶¶ 73-76; ECF No. 30-11 at 8-9.)

On October 24, 2013, Deputy Bureau Chief Roger Ainsworth ("Ainsworth") sent correspondence to Sheriff John Cooke, recommending that plaintiff's employment be terminated.

(ECF No. 33 at ¶ 77; ECF No. 30-12 at 2.)   Ainsworth stated that he had reviewed a recent investigation, as well as prior disciplinary actions and performance appraisals. (ECF No. 30-12 at 2.) Ainsworth then, *inter alia*, summarized Wagoner's investigation into plaintiff's conversation with Porter on October 8.   (*Id*. at 2-3.)   On December 20, 2013, Sheriff Cooke terminated plaintiff's employment.  (ECF No. 33 at ¶ 79; ECF No. 30-13 at 2-3.)   In doing so, Sheriff Cooke found that plaintiff had violated Weld County Code and WCSO policy regarding insubordination, and that plaintiff had displayed a lack of candor by providing "deceptive responses" during Wagoner's investigation.  (ECF No. 30-13 at 2-3.)  Sheriff Cooke also stated that he had taken into account plaintiff's past disciplinary history.  (*Id*. at 3.)

## III.    Legal Standard for Summary Judgment

Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).   Initially, the movant bears the "responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  If this burden is met, then the non-moving party must set forth specific facts showing that there is a genuine dispute for trial. *Id*. at 324.  A fact is material if it has the potential to affect the outcome of a dispute under applicable law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995).  An issue is genuine if a rational trier of fact could find for the non-moving party.  *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

In performing this analysis, the factual record and any reasonable inferences therefrom are construed in the light most favorable to the non-moving party.  *Id*.  However, a mere "scintilla of

evidence" is insufficient to avoid summary judgment. *Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009).  Instead, a non-movant "must proffer facts such that a reasonable jury could find in her favor." *Id.*

## IV.    Legal Test for Freedom of Speech Retaliation Claims

The parties agree that the applicable legal test for plaintiff's claim of retaliation in the First Amendment/freedom of speech context is the "*Garcetti/Pickering*" test.  (*See* ECF No. 29 at 4-5; ECF No. 31 at 5-6.)  That test involves the following considerations:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th. Cir. 2009)

In its motion for summary judgment, defendant challenges plaintiff's ability to establish only the first and third considerations above.  (ECF No. 29 at 5.)  However, in its reply, defendant correctly asserts that, in responding to the motion for summary judgment, plaintiff "opened the door" as to whether her speech was on a matter of public concern—the second factor in the *Garcetti/Pickering* test.  (ECF No. 32 at 13.)  Even though defendant did not challenge this issue originally, for some reason plaintiff decided to argue it in her response (ECF No. 31 at 7-10), which then provided defendant the opportunity to counter in its reply (ECF No. 32 at 13-14).  Thus, the Court will analyze each of the first three factors. *Cf. Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (10th Cir. 2007) (explaining that the Tenth Circuit had discretion to consider an issue addressed for the first time in a reply brief because the same issue had been raised in the other party's answering brief).

**V.     Discussion**

**A.     Speech Pursuant to Official Duties**

In *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." More recently, the Supreme Court clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. ___, 134 S.Ct. 2369, 2379 (2014). As the *Lane* Court explained, in *Garcetti*, it was one of the responsibilities of the plaintiff's job to write a memorandum addressing the disposition of a criminal case. *Lane*, 134 S.Ct. at 2379. It was the writing of the memorandum, not the content of the memorandum that was of concern to the Supreme Court. *See Garcetti*, 547 U.S. at 421-22; *Lane*, 134 S.Ct. at 2379 (explaining that *Garcetti* "made explicit that its holding did not turn on the fact that the memo at issue concerned the subject matter of the prosecutor's employment …..") (quotation and alteration omitted). Similarly in *Lane*, the speech at issue was the plaintiff's sworn testimony in a judicial proceeding, not the subject matter of the plaintiff's testimony. *Lane*, 134 S.Ct. at 2379-2380.

In this light, plaintiff's speech was not within her official duties. The Court starts by identifying the speech at issue—plaintiff's October 8, 2013 conversation with Porter in which plaintiff expressed frustration with new policies and/or standards for the VSU, stated that Calvin had

been hired because of political connections, and believed that Calvin was "working a real estate job while working on the WCSO clock."[9]   (ECF No. 33 at ¶¶ 47, 49; ECF No. 30-10 at 2.)

Applying the principles of *Garcetti* and *Lane*, here, the "speech at issue" is plaintiff speaking to Porter about office policies and her belief that Calvin was engaging in impropriety.   The question then is whether plaintiff speaking to Porter was part of her official duties.   Defendant effectively answers this question in its repeated assertions that plaintiff speaking with Porter was against office policy because, in doing so, she went "outside the chain of command."   (*See* ECF No. 29 at 3, 7; ECF No. 32 at 4.)   Notably, defendant characterizes this conversation as "talk[ing] to whomever [plaintiff] wanted in a position at or above her as to whatever she wanted."   (ECF No. 32 at 4.)   This hardly sounds like speech that is pursuant to plaintiff's official duties for purposes of *Garcetti*.   As such, plaintiff's conversation with Porter was not made pursuant to her official duties, even though that conversation concerned office policies and alleged office irregularities.   *See Lane*, 134 S.Ct. at 2379.

Defendant argues that plaintiff cannot establish this element of the *Garcetti/Pickering* test because she conceded the matter in her deposition testimony.   (ECF No. 29 at 6-7 ("Plaintiff admitted she made her statements within the scope of what she believed were her official duties as

---

[9] Plaintiff asserts that she also spoke with Commander Haffner about her concerns over Calvin. (*See* ECF No. 1 at ¶ 21; ECF No. 31 at 7.)  However, no evidence related to the content, form, or context of plaintiff's alleged conversation with Commander Haffner has been presented.  Other than *defendant's* references to Commander Haffner in its statement of undisputed material facts (*see* ECF No. 30 at ¶¶ 60, 62, 66), there are no allegations, let alone evidence, presented in plaintiff's summary-judgment papers as to her conversation with Commander Haffner (*see generally* ECF No. 31-12).  Moreover, even if plaintiff's citation to her affidavit in her response to the motion for summary judgment was for the purpose of illuminating the alleged conversation with Commander Haffner (ECF No. 31 at 7), the citation violates the Court's Civil Practice Standards in that the affidavit was not cited to for this reason in plaintiff's response statement of material facts and plaintiff failed to cite to any specific paragraph of the affidavit relevant to this issue.

a victim's advocate and protection of victims in Weld County.")).  First, the portions of deposition transcript to which defendant cites (ECF No. 33 at ¶ 51), do not support the contention that plaintiff conceded that her conversation with Porter was pursuant to her official duties, especially given that the factual record must be construed in a light most favorable to plaintiff.  *See Adams*, 233 F.3d at 1246.  Notably, in none of the cited transcript sections is plaintiff asked whether her speech was made pursuant to her official duties, nor can plaintiff's responses be construed as to definitively answer that un-asked question.  Second, defendant cites to no authority for the proposition that plaintiff could concede a legal issue during her deposition testimony based solely on defendant's interpretation of her answers.  (*See generally* ECF No. 29 at 6-7.) As defendant asserts, this is an issue for the Court to decide.  (*See id*. at 5); *see also Dixon*, 553 F.3d at 1302.

### B.      Matters of Public Concern

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 134 S.Ct. at 2380 (quotation and internal quotation omitted).  Important to this inquiry is the "content, form, and context of the speech." *Id*. (quotation omitted).  In *Lane*, the Supreme Court found as relevant the content of the plaintiff's speech in that it involved public corruption, and the form and context of the same as it involved sworn testimony in a judicial proceeding. *Id*.  The Tenth Circuit has instructed courts to "focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000).  An attempt to disclose potential, rather than actual, misconduct is all that is required. *Eisenhour v. Weber Cnty.*, 744 F.3d

1220, 1228 (10th Cir. 2014).  It is plaintiff's burden to establish that her speech involved a matter of public concern.  *Considine v. Bd. of Cnty. Comm'rs of Cnty. of Adams, Colorado*, 910 F.2d 695, 700 (10th Cir. 1990).

Plaintiff argues that her speech involved a matter of public concern because "it clearly identified matters which give rise to the alleged impropriety or malfeasance of [Calvin] relating—at least to the possibility—that government vehicles were being used improperly, as were government email accounts which [Calvin] appears to have utilized to advertise her status as a dual-hat victim's advocate/real estate agent." (ECF No. 31 at 8.)  Thus, at first glance, plaintiff's speech would appear calculated to disclose misconduct.  *See Lighton*, 209 F.3d at 1224-1225.  However, upon closer review, there are numerous evidentiary problems with plaintiff's position.

As an initial matter, there is only limited evidence properly before the Court as to the actual content of plaintiff's conversation with Porter.  Notably, in her response statement of facts, plaintiff fails to allege any facts, let alone present evidence, concerning the conversation.[10]  (*See generally* ECF No. 31-12.)  Thus, plaintiff has presented no facts related to her motive or calculation in speaking with Porter.  *See Lighton*, 209 F.3d at 1224.  Defendant, though, has presented some evidence shedding a modicum of light on the content of the conversation.  In Porter's "Witness Statement," Porter asserts that plaintiff expressed (1) frustration and confusion regarding new office policies, (2) her belief that Calvin had been hired due to political connections, and (3) her belief that Calvin was working a real estate job at the same time as working on the WCSO's clock.  (ECF No. 30-10 at 2.)

---

[10] Although plaintiff alleges some general facts about the conversation with Porter in her affidavit (*see* ECF No. 31-1 at ¶ 17), as discussed *supra*, those facts have not been presented in a manner consistent with this Court's Civil Practice Standards.  Thus, the Court will not consider them.

Plaintiff relies only on her statements regarding Calvin's alleged work as a real estate agent to support her contention that her speech was a matter of public concern. (*See* ECF No. 31 at 8.) Thus, the Court need not consider whether her statements about office policies and the alleged reasons behind Calvin's hiring constituted matters of public concern. As to Calvin's alleged real estate activities there is simply no evidentiary record of "clearly identified matters which give rise to the alleged impropriety or malfeasance of [Calvin] …," as plaintiff alleges. (*See id.*) Porter's recitation of plaintiff's statement does not provide *any* explanation for the basis of plaintiff's belief that Calvin was doing her real estate job while being paid for her WCSO job, and certainly not on the ground that Calvin was improperly using WCSO vehicles and email accounts. (*See generally* ECF No. 30-10 at 2.) Nor does it suggest plaintiff's motive in making the statement or whether it was calculated to reveal misconduct. *See Lighton*, 209 F.3d at 1224. Moreover, as defendant asserts in reply, to the extent that plaintiff relies on alleged facts of which she was not aware at the time of her conversation with Porter, such as Calvin's payroll records or the testimony of a volunteer victim advocate (*see* ECF No. 32 at 13-14), as well as defendant's alleged failure to investigate plaintiff's allegations against Calvin, these could not have been the matters that plaintiff clearly identified to Porter.

Next, even if plaintiff had properly presented evidence regarding the facts of which she allegedly was aware—the presence in WCSO vehicles of Calvin's real estate business cards and a camera allegedly containing real estate pictures, as well as an email sent by Calvin to victim advocates explaining that Calvin was a realtor—none of these indicate that Calvin was engaged, or potentially engaged, in impropriety. As to the business cards, the mere fact that they were allegedly found in a WCSO vehicle does not mean that Calvin was using the vehicle to perform her real estate

work, especially given that plaintiff admitted in her deposition that she did not know who put the business cards in the vehicle. (*See* ECF No. 33-1 at 2:10-18.) With respect to the camera, this is similarly deficient in light of plaintiff's deposition testimony, as she admitted that she did not know who took the pictures or who owned the camera. (*Id*. at 3:16-4:3.)

As for Calvin's email to victim advocates, although plaintiff cites to an exhibit containing that email (*see* ECF No. 31 at 8), she failed to provide the Court with a copy of the same. This failure puts the Court in the impossible position of having to construe the propriety of something that it has never seen. Nonetheless, the Court imagines that context was very important. As plaintiff asserts, the alleged email "introduced" Calvin to the victim advocates. (*Id*.) In the light of an introductory email, Calvin allegedly informing the victim advocates that she was a realtor and providing them with an alternate email would have been a perfectly natural way to introduce herself and provide further contact options, especially given that plaintiff does not provide any explanation or basis in fact for believing that Calvin sought to sell any services or promote herself in the email. (*See id*.)[11]

Simply put, the facts that plaintiff has alleged do not support a contention that Calvin was engaged in impropriety or malfeasance, and, even if they did, plaintiff has not properly presented evidence related to the same—reason alone to find that she has failed to establish this part of the *Garcetti/Pickering* test. *See Considine*, 910 F.2d at 700; *see also Eisenhour*, 744 F.3d at 1229 (reversing summary judgment in favor of the employer after finding, *inter alia*, that the employee had established speech on a matter of public concern by presenting evidence of a lapse by a public

---

[11] One of plaintiff's co-workers, Sheriff Cooke, described the email as follows during his deposition: "She's not soliciting business. It looks like more of a little bit of a background information on her.… It looks like she's trying to get more information about victim advocates and she was saying, Hey, this is my background." (ECF No. 33-4 at 12:6-12.)

body charged with overseeing the judiciary).  Moreover, in light of the deficiencies in plaintiff's evidence, the Court is also persuaded that, even if plaintiff told Porter that her suspicions concerning Calvin's real estate work were based on the email, business cards and camera, these matters would not be of interest or concern to the public.  *See Lane*, 134 S.Ct. at 2380.  Specifically, the public would not be concerned or informed by an introductory email being sent to co-workers, and business cards and a camera being found in a county vehicle, when plaintiff admitted during her deposition that she did not know who put the business cards in the vehicle or to whom the camera belonged. *See Lee v. Nicholl*, 197 F.3d 1291, 1295 (10th Cir. 1999) (explaining that "speech must sufficiently inform the issue as to be helpful to the public in evaluating the conduct of the government." (quotation omitted).

Thus, the content of plaintiff's conversation with Porter shows little evidentiary or legal basis for finding it to be a matter of public concern.  To the extent that the form and context of the conversation is also relevant, those factors do not help plaintiff.  Notably, Porter's "Written Statement" reflects that the conversation was purely an informal discussion between two co-workers. *See Thayer v. City of Holton*, 515 F. Supp. 2d 1198, 1207 (D. Kan. 2007) ("The relatively private and informal setting and limited audience for the comments are factors suggesting that the comments were not matters of public concern.") (citing *Button v. Kibby-Brown*, 146 F.3d 526, 531 (7th Cir. 1998); *Roe v. City & Cnty. of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997)).  Moreover, given the lack of evidence discussed *supra*, there is no basis to find that plaintiff was motivated by broader public purposes in telling Porter that Calvin was doing real estate work on the WCSO clock.  *See Lee*, 197 F.3d at 1295 (explaining that, in analyzing form and context, a court should examine the employee's motive and "determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose.") (quotation omitted).

As a result, plaintiff's statements to Porter on October 8, 2013 did not involve a matter of public concern. Although a failure to establish any one of the *Garcetti/Pickering* factors is sufficient alone to find the alleged speech unprotected, *see Fields v. City of Tulsa*, 753 F.3d 1000, 1014 (10th Cir. 2014), the Court will still address the third factor—balancing the interests of defendant against those of plaintiff.

## C.     The Balancing Test

"In balancing the employee's interest in expression against the government's interest in efficiency, a court must consider the manner, time, and place of the employee's expression, as well as the events leading up to it." *Fields*, 753 F.3d at 1014 (quotation and internal quotation omitted). In that regard, the only relevant employer interest is "avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships." *Trant v. Oklahoma*, 754 F.3d 1158, 1166 (10th Cir. 2014) (emphasis in original) (quotation omitted). However, an employer need only establish that an employee's speech could "*potentially* become so disruptive" to the employer's operations so as to outweigh the employee's speech interest. *Id*. (emphasis in original). Pertinent to this inquiry is whether the speech interferes with work, personnel relationships, or the employee's job performance. *Fields*, 753 F.3d at 1014. In addition, "'the employer's burden to justify its restriction on speech increases in proportion to the value of that speech in the public debate.'" *Id*. (alteration omitted) (quoting *Curtis v. Okla. Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998)).

Here, there has been no allegation that plaintiff's speech interfered, or potentially interfered, with her own job performance. (*See generally* ECF Nos. 29, 32.) Next, although plaintiff's speech concerned Calvin, plaintiff's direct supervisor, and Calvin's work conduct/performance, defendant has not argued or presented any evidence that Calvin and plaintiff's work relationship was affected,

18

even though this would seem likely given the tenor of plaintiff's statements. Neither has defendant argued that the work relationship could have potentially been affected. The closest defendant gets in this regard is asserting that an employee's speech interferes with an employer's operations when it causes discord between the employee and a co-worker. (*See* ECF No. 32 at 11.) This may be true. The problem, though, is that defendant fails to connect this legal principle to any facts from this case. (*See id*. at 11-12.) Notably, in the limited sections of Calvin's deposition testimony to which defendant cites in the RSUMF, none are cited for the principle that plaintiff's speech caused discord with Calvin, or even potentially could have caused discord. (*See* ECF No. 33 at ¶¶ 57, 59.)

Nonetheless, although defendant does not argue this point, there is evidence that plaintiff's speech interfered with the functioning of the WCSO, at least to the extent that Wagoner was required to conduct an investigation into the same; an investigation that spanned from October 9, 2013 to October 15, 2013. (ECF No. 30-11 at 3-7.) Plaintiff also exacerbated the length of the investigation by failing to acknowledge immediately that she had even conversed with Porter. (*See id*.) However, given that defendant does not make this argument, there is no evidence reflecting what Wagoner's duties were, other than that he was "in charge" of the VSU. (*See* ECF No. 33-3 at 2:21-24.) Thus, it is not possible to assess whether his duties or work were disrupted by plaintiff's speech.

Instead, defendant focuses its argument on plaintiff's pre and post-speech conduct. (*See* ECF No. 29 at 9-10; ECF No. 32 at 12.) In *Trant*, the Tenth Circuit explained that an employer's interest is in avoiding direct disruption from "*the speech itself*." *Trant*, 754 F.3d at 1166 (emphasis in original). Defendant, however, fails to explain how plaintiff's past or post-speech misconduct contributed to avoiding potential disruption from her actual speech. Defendant does assert that plaintiff's speech "could reasonably be seen (and was seen) as part of a broader disciplinary problem …." (ECF No. 32 at 12.) That may be true, but it still does not explain why plaintiff's disciplinary

problems should be subsumed into her actual speech for purposes of determining whether defendant was attempting to avoid potential disruption from the speech.[12]  *See Gardetto v. Mason*, 100 F.3d 803, 816 (10th Cir. 1996) (disregarding "a great deal of evidence relating to episodes of rude and inappropriate conduct that may have interfered with the efficiency of [the employer's] operations, none of the episodes involved the four remaining speech incidents at issue in this case.").

Rather, the past events leading up to plaintiff's speech, as well as plaintiff's post-speech conduct, are far more relevant to the fourth and fifth factors in the *Garcetti/Pickering* test—whether plaintiff's speech was a motivating factor in the decision to fire her, and whether defendant would have reached the same employment decision in the absence of plaintiff's speech.  Specifically, the Tenth Circuit has explained that "'a borderline or marginal candidate ought not to be able, by engaging in protected conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.'"  *Trant*, 754 F.3d at 1167 (quoting *Mt. Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 286, 97 S.Ct. 568 (1977)) (alterations omitted).  Although there is a wealth of evidence submitted in this case with regard to plaintiff's disciplinary history and failure to tell the truth during Wagoner's post-speech investigation, all of which appears to be largely undisputed (*see* ECF No. 33 at ¶¶ 11, 12, 15, 24, 25-27, 32, 36, 41-44,

---

[12] It is notable in this regard that defendant cites to the First Circuit Court of Appeals' decision in *Diaz Bigio v. Santini*, 652 F.3d 45 (1st Cir. 2011).  In that decision, the First Circuit explained that, for purposes of qualified immunity, the defendant could have reasonably predicted that an employee's retention may have caused disruption in light of a broader disciplinary problem.  *Id*. at 54.  First, *Diaz Bigio* involved a qualified immunity analysis, which is not the case here.  Second, the First Circuit's focus was on the disruption that the employee's *retention* could have caused, rather than the disruption that her speech could have potentially caused.  Third, the First Circuit's decision is not binding.  Thus, *Diaz Bigio* is not helpful.

58-60, 62, 64-67, 72-76), for some reason, defendant has chosen not to pursue these elements of the *Garcetti/Pickering* test, (ECF No. 29 at 3).[13]

Nevertheless, despite the issues with granting summary judgment to defendant on the *Pickering* balancing test, *see Dixon*, 553 F.3d at 1304 ("unless the government employer can show that the termination was based on legitimate reasons grounded in the efficient conduct of public business, there is no need to proceed to balancing"), as discussed *supra*, plaintiff has still failed to establish that her speech involved a matter of public concern. Accordingly, the motion for summary judgment will be granted.

**VI.    Conclusion**

For the reasons set forth herein, the Court:

(1)    GRANTS IN PART and DENIES IN PART defendant's motion to strike (ECF No. 37); and

(2)    GRANTS defendant's motion for summary judgment (ECF No. 29). The Clerk is directed to enter Judgment in favor of defendant DISMISSING this case.

The Order Setting Case for Trial (ECF No. 41) is VACATED.

---

[13] In the motion for summary judgment, defendant asserts, without citation, that "the basis for [p]laintiff's termination normally is a question of fact for the trier of fact." (ECF No. 29 at 3.) That may be the case when there are disputed issues of material fact as to the basis for an employee's termination. But, when there are undisputed material facts as to the same, then summary judgment would be the applicable field in which to test those facts. For example, in a case to which defendant cites for a different purpose, the Tenth Circuit explicitly held that summary judgment "is appropriate on the fifth step [of *Garcetti/Pickering*] when 'any reasonable jury would have found that the plaintiff would have been terminated even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech.'" *Trant*, 754 F.3d at 1167-1169. The Court can only assume that defendant believes that reasonable jurists would differ as to step five.

**SO ORDERED.**

DATED this 19th day of February, 2016.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge